ARKANSAS STATE BANK
COMMISSIONER,
Appellee,

v.

The RESOLUTION TRUST CORPORA-
TION, an agency of the United States;
The Federal Deposit Insurance Corpo-
ration, an agency of the United States;
Appellants,

and

Robert L. Clarke, in his official capacity
as the Comptroller of the Currency
of the United States,

and

The Arkansas Independent Bankers Asso-
ciation, Inc., a Non–Profit Arkansas
Corporation; (Intervenor below) Appel-
lee,

and

Worthen Bank & Trust Company, N.A.
(Intervenor below).

ARKANSAS STATE BANK
COMMISSIONER,
Appellee,

v.

The RESOLUTION TRUST CORPORA-
TION, an agency of the United States;
The Federal Deposit Insurance Corpo-
ration, an agency of the United States;
and Robert L. Clarke, in his official
capacity as the Comptroller of the Cur-
rency of the United States,

and

The Arkansas Independent Bankers Asso-
ciation, Inc., a Non–Profit Arkansas
Corporation; (Intervenors below) Ap-
pellee,

and

Worthen Bank & Trust Company, N.A.,
(Intervenor below) Appellant.

ARKANSAS STATE BANK
COMMISSIONER,
Appellee,

v.

The RESOLUTION TRUST CORPORA-
TION, an agency of the United States;
The Federal Deposit Insurance Corpo-
ration, an agency of the United States;

and

Robert L. Clarke, in his official capacity
as the Comptroller of the Currency
of the United States, Appellant,

and

The Arkansas Independent Bankers Asso-
ciation, Inc., a Non–Profit Arkansas
Corporation; (Intervenor below) Appel-
lee,

and

Worthen Bank & Trust Company, N.A.,
(Intervenor below).

Nos. 90–2115, 90–2116 and 90–2194.

United States Court of Appeals,
Eighth Circuit.

Submitted Aug. 15, 1990.

Decided Aug. 28, 1990.

Dorothy L. Nichols, Washington, D.C., for Resolution Trust and Herman Ivester, Little Rock, Ark., for appellant.

Leonard Rubin, Washington, D.C. and Jeannette Denhammcclendon, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and HEANEY, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The issue before us is the validity of a regulation adopted by the Resolution Trust Corporation, 55 Fed.Reg. 22,323 (to be codified at 12 C.F.R. § 1611.1), that permits banks making emergency acquisitions of failed or failing thrifts under 12 U.S.C.A. § 1823(k) (West 1989) to retain and operate branches of the thrifts as bank branches. The RTC issued an order under the regulation to override the branch bank restrictions of Arkansas law with respect to the bid of Worthen Bank & Trust Company to purchase Independence Federal Bank, FSB. The district court held the regulation to be invalid, finding that the statute referred only to the ability of savings associations to operate branches and not to the ability of a bank to retain and operate the branches. We are convinced that the regulation is based on a permissible construction of the underlying statute, and we reverse the judgment of the district court.

The facts giving rise to this controversy are simple, and we recite them essentially as stated in the district court order. On February 13, 1990, the RTC held an instructional bid meeting to provide information about two savings and loan associations to be offered for sale. The RTC representative explained that its reading of 12 U.S.C.A. § 1823(k), a part of the comprehensive Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183 authorized the RTC to preempt Arkansas restrictions on branch banking by an acquiring bank. The RTC informed the Arkansas State Bank Commissioner that it was willing to file a declaratory action, but a few days later announced that it had scheduled another bid meeting for February 27, 1990. The Commissioner on February 23, 1990 filed this action seeking emergency declaratory relief, a temporary restraining order, and a preliminary injunction to prevent the RTC's announced intention to preempt or override the Arkansas branch bank law. After a hearing before the district court, the RTC cancelled the bid meeting. On June 8, 1990, the RTC held another bid meeting. On June 21, 1990, Worthen submitted a bid for certain assets and liabilities as well as the twenty branch offices of Independence. Worthen conditioned its bid on the RTC taking action to override the Arkansas branch banking law so it could operate

Independence's twenty branch offices located in fifteen counties throughout Arkansas as branch banks of Worthen. Worthen submitted the sole bid for Independence as a complete entity. Nineteen other bids were submitted for various combinations of the branches, but not all of the branches were covered by the separate branch bids. Worthen's bid included a premium of $1,500,001 for acquiring all of the branches together. Several of the separate branch bids also requested an override of the state banking law.

The activity in Arkansas coincided with action on the regulatory front. On April 19, 1990, the RTC published a notice that it proposed to adopt a rule permitting banks to retain and operate branches of failed or failing thrifts as banks. 55 Fed.Reg. 13,-543 (1990) (to be codified at 12 C.F.R. § 1611.1) (proposed April 11, 1990).[1] On May 24, 1990, the RTC board of directors adopted the proposed regulation. It was effective June 1, 1990. 55 Fed.Reg. 22,323.

The Arkansas laws the RTC plans to override would prohibit Worthen from operating the Independence branches as banks unless each was separately chartered. Ark.Stat.Ann. § 23–32–1202 (Michie Supp.1989). The statutes provide that no bank shall engage in the business of banking at any location other than at a principal banking office or at a full service branch bank approved by supervisory banking authority. *Id.* Banks are allowed to establish full service branches anywhere within the county in which the principal banking office is located, or at any former principal banking office. Ark.Stat.Ann. § 23–32–1202(b). These limitations are being phased out. In 1994, banks may locate one or more full service branches within contiguous counties, and, beginning in 1999, they will be able to locate one or more branches anywhere in the state.[2] The Commissioner is authorized to approve applications for branches by an order containing findings of fact and conclusions of law with certain specified required findings.[3]

After the Commissioner withdrew his motion for a preliminary injunction in the

1. After a section stating the purpose, the regulation provided:
(a)(2) The regulations of this section provide for the retention and operation by acquiring banks of the offices of savings associations acquired pursuant to section 13(k).
(b) Each existing office or other existing facility of each savings association that is merged or consolidated with, or the assets and liabilities of which are transferred to, an insured bank pursuant to section 13(k) may be retained by the insured bank and operated by the bank as a branch or other facility. 55 Fed.Reg. 13,543, 13,545. *Adopted* at 55 Fed. Reg. 22,323, 22,328.

2. Arkansas code section 23–32–1202 provides:
(a) No banking institution shall engage in the business of banking at any location other than at a principal banking office or branch bank in this state except as otherwise permitted by law.
(b) Any bank may establish a full service branch and may establish, maintain, and use a customer-bank communication terminal, as that term is defined in § 23–32–1301, provided that its supervisory banking authority approves its application for the full service branch. Full service branches and customer-bank communication terminals may only be established as follows:
(1) A bank may establish full service branches and customer-bank communication

terminals anywhere within the county in which the establishing bank's principal banking office is located;
(2) A bank which relocates its principal banking office may continue to use its former principal banking office location as a full service branch and customer-bank communication terminal so long as the use as a banking facility is uninterrupted;
(3) In addition to the above subdivisions, after December 31, 1993, a bank may locate one (1) or more full service branches and customer-bank communication terminals anywhere within any counties contiguous to the county in which its principal banking office is located;
(4) After December 31, 1998, a bank may locate one (1) or more full service branches and *customer-bank communication terminals* anywhere in this state.

3. Arkansas code section 23–32–1203(a) provides as follows:
(a) The Bank Commissioner shall have the authority to approve the application of a state-chartered bank to establish a full service branch, if he shall find upon investigation that the establishment of the branch is economically feasible and will serve the public convenience and necessity. Ark.Stat.Ann. § 23–32–1203(a) (Michie Supp. 1989).

district court, the court granted the Independent Bankers Association of the State of Arkansas the right to intervene. After receiving notice of the RTC's intent to override Arkansas law, the Commissioner and Independent Bankers filed motions for a temporary restraining order and preliminary injunction, and Worthen filed motions for a preliminary injunction and declaratory relief. The RTC moved to dismiss the complaints of the Commissioner and Independent Bankers, as did the Federal Deposit Insurance Corporation and Comptroller of the Currency.

The district court, after conducting another hearing, commented that the statutes in question stated nothing about the operation of branches, or a bank converting branches to bank branches and so operating them. *Arkansas State Bank Commissioner v. Resolution Trust Corp.*, 745 F.Supp. 550, 553 (E.D.Ark.1990). The court observed that the Commissioner's and Independent Bankers' argument that the override power of the statute extends only to the acquisition of the branches and not to their operation appears overly restrictive. The court stated, however, that when read with 12 U.S.C.A. § 1823(k)(4)(A), their argument became more tenable. *Id.* at 9. After looking to two district court decisions in Colorado and New Mexico and acknowledging the rule of the Supreme Court of the United States in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court turned to a detailed analysis of the statutes, and particularly to the branching provisions in paragraph (k)(4). The court concluded:

> It is obvious to this Court that Section (k)(4) means that after an acquisition, existing branches may be retained and operated if they are maintained and operated as branches of a savings association. This Court agrees with the Colorado District Court that they cannot be retained and operated as branches of the acquiring bank.

*Arkansas State Bank Comm'r*, slip op. at 12.

The court rejected arguments that the McFadden Act, 12 U.S.C.A. § 36 (West 1989), was also a barrier to the action of the RTC in adopting the regulation. While recognizing the broad authority of agencies of the United States government, the court further stated:

> At the same time, the Court is equally convinced that in this case RTC, in issuing its Override Rule, clearly overstepped its authority pursuant to the language of the statute under which it was acting.... [T]he RTC cannot by regulation amend FIRREA to add provisions that are not there, any argument *ab inconvenienti* to the contrary, notwithstanding. Accordingly, plaintiff's and intervenor Independent Bankers' request for declaratory and injunctive relief is granted.

*Arkansas State Bank Comm'r*, slip op. at 13–14.

The court granted declaratory and injunctive relief to the Commissioner and Independent Bankers. It declared 12 C.F.R. § 1611.1 null and void for exceeding the RTC's authority, and it enjoined appellants from approving branch banks in violation of Arkansas branch banking laws. It also denied the motions to dismiss filed by the various parties. This appeal followed; we expedited briefing and oral arguments.

I.

Worthen's proposed acquisition of Independence and its twenty branches is authorized under 12 U.S.C.A. § 1823(k)(1)(A), and it is the interplay of this provision with 12 U.S.C.A. § 1823(k)(4), relating to branching that is the center of the controversy as to whether RTC's promulgation of 12 C.F.R. § 1611.1 finds statutory authorization. "Notwithstanding any provision of state law," upon determination of severe financial conditions that threaten the stability of a significant number of savings associations, or of savings associations possessing significant financial resources, the RTC "may authorize ... [that] savings association ... to merge or consolidate with, or to transfer its assets and liabilities to, any other savings association or any insured

bank, ..." and "any company to acquire ... the assets or assume the liabilities thereof." 12 U.S.C.A. § 1823(k)(1)(A)(i). Such transactions "shall be on such terms as the Corporation shall provide." 12 U.S. C.A. § 1823(k)(1)(A)(ii).[4]

The branching provisions are as follows:

If a merger, consolidation, transfer, or acquisition under this subsection involves a savings association eligible for assistance and a bank or bank holding company, a savings association may retain and operate any existing branch or branches or any other existing facilities. If the savings association continues to exist as a separate entity, it may establish and operate new branches to the same extent as any savings association that is not affiliated with a bank holding company and the home office of which is located in the same State.

12 U.S.C.A. § 1823(k)(4)(A).

This subparagraph is followed by subparagraph (B) containing restrictions that deal primarily with a savings association that does not have its home office in the state of the bank holding company subsidiary. These restrictions are for the most part irrelevant to our inquiry.

We look to *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for guidance in deciding the issues before us. The *Chevron* Court stated:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they

---

**4.** The provisions of 12 U.S.C. § 1823(k)(1) that are significant to our discussion are as follows:

**(k) Emergency acquisitions**
**(1) In general**
**(A) Acquisitions authorized**
**(i) Transactions described**
Notwithstanding any provision of State law, upon determining that severe financial conditions threaten the stability of a significant number of savings associations, or of savings associations possessing significant financial resources, the Corporation, in its discretion and if it determines such authorization would lessen the risk to the Corporation, may authorize—
**(I)** a savings association that is eligible for assistance pursuant to subsection (c) of this section to merge or consolidate with, or to transfer its assets and liabilities to, any other savings association or any insured bank,
**(II)** any other savings association to acquire control of such savings association, or

**(III)** any company to acquire control of such savings association or to acquire the assets or assume the liabilities thereof.
The Corporation may not authorize any transaction under this subsection unless the Corporation determines that the authorization will not present a substantial risk to the safety or soundness of the savings association to be acquired or any acquiring entity.
**(ii) Terms of transactions**
Mergers, consolidations, transfers, and acquisitions under this subsection shall be on such terms as the Corporation shall provide.

.  .  .  .  .

**(vi) Continued applicability of certain state restrictions**
Nothing in this subsection overrides or supersedes State laws restricting or limiting the activities of a savings association on behalf of another entity.

are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provison (sic) for a reasonable interpretation made by the administrator of an agency.

467 U.S. at 842–44, 104 S.Ct. at 2781–83 (footnotes omitted).

*Chevron*, in a footnote, makes clear that a court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11. The FDIC and the RTC argue that paragraphs 1823(k)(1) and (4), together with the broad rulemaking authority under 12 U.S.C.A. § 1441a(b)(12) (West Supp.1990), and the authorization to act "notwithstanding any provision of State law," 12 U.S.C.A. § 1823(k)(1)(A)(i), directly grant the RTC the power to issue the regulation that overrides state law. Worthen joins in this argument. The Independent Bankers argue in opposition that the override rule is contrary to the express provisions of paragraphs (k)(1) and (4). These completely contradictory arguments at least raise the specter of ambiguity. Indeed, the Supreme Court, when considering similarly contradictory arguments, analyzed a statute and agreed that it admitted of either reading. *Young v. Community Nutrition Inst.*, 476 U.S. 974, 980–81, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986). The RTC and FDIC adopt ambiguity, which the RTC may resolve, as a fallback position, although Worthen does not join in asserting this argument.

We are not convinced that Congress has directly spoken to the precise question so that its intent is clear and the issue can thus be disposed of under the first part of the *Chevron* inquiry. This requires us to examine the RTC statement accompanying the final rule to determine whether 12 C.F.R. § 1611.1 is based on a permissible construction of the statute. In the April 1990 notice of the proposed rule, the RTC discussed the background of the savings and loan crisis, outlined its need for the regulation, and articulated its interpretation of the statutory authority for its proposed action. 55 Fed.Reg. 13,543–45.[5] On June 1, the adoption of the rule was similarly accompanied by a reasoned explanation that discussed the statutory authority. 55 Fed.Reg. 22,323–28. The RTC reiterated the statement from its notice that the branching provisions of subparagraph (4)(A) expressly allow banks to retain and operate as bank branches the thrift branches they acquire.[6] The notice and the state-

5. The notice sets out the language authorizing the transactions, 12 U.S.C.A. § 1823(k)(1)(A)(i), and states that such transactions should be on the terms provided in 12 U.S.C.A. § 1823(k)(1)(A)(ii). The notice states: "Under these provisions, the RTC has broad power to authorize emergency acquisitions of failed or failing savings associations (or "thrifts") by banks and bank holding companies, despite any provisions of State law that would otherwise prohibit or restrict such transactions." 55 Fed. Reg. 13,543. The RTC then discussed the branching provisions in (k)(4), finding its rule to be consistent with its reading of that provision.

6. In answering comments that the statute does not expressly authorize the override of state bank branching restrictions, the RTC stated:

It is the view of the RTC that under the proper reading of the first sentence of subparagraph (4)(A) of section 13(k), the term "savings association" in the second clause, like the term "savings association" in the first clause, refers to the savings association as it exists prior to consummation of the emergency transaction. Accordingly, it is the RTC's view that the second clause includes savings associations that subsequently cease to exist upon consummation of the transaction, as well as those that continue to exist after the transaction. If the second clause is not read in this way, the terms "merger" and "consolidation" are effectively read out of the statute, since the result of merging or consolidating a failed or failing savings association and a bank is most likely a bank. In addition, reading the second clause to refer only to savings associations that continue to exist after the transaction would apparently render the clause unnecessary; a savings association that continues to exist after the transaction presumably would be permitted to retain and operate existing branches without the need for the authority provided in the clause. Moreover, the branching authority granted in the second

ment adopting the final rule further reasoned that if these provisions did not expressly address the issue, the RTC was given power to authorize emergency transactions "notwithstanding any provisions of state law," and this, together with the RTC's rulemaking authority, was broad enough to permit the RTC to fill gaps in the manner proposed.[7] The statement further discussed the policies behind its rule, namely that banks would pay a substantial premium to acquire existing thrift branches that they could operate as banks, and that they were unlikely to bid for troubled thrifts, or would bid less if faced with the cost of chartering and operating the branches as separate banks.[8]

The RTC then considered arguments based on an exchange between Senators Wirth and Riegle and a statement inserted in the Congressional Record by Congressman Leach, but found that the arguments and the statement concerned non-emergency conversion transactions under 12 U.S.C.A. § 1815(d)(2)(B) rather than emergency conversion provisions under paragraphs (k)(1) and (4). 55 Fed.Reg. 22,325–26. Further, the RTC found authority in the Senate Report for giving a broad reading to the override provision.[9]

sentence of subparagraph (4)(A) expressly applies where the "savings association continues to exist as a separate entity"; the implication, by contrast, is that application of the branching authority granted in the second clause of the first sentence includes savings associations that do not continue to exist as a separate entity.
55 Fed.Reg. at 22,325.
The RTC, after finding no assistance from the Conference Report on FIRREA, considered alternative interpretations of (4)(A):
The RTC's proposal also discusses an alternative reading of the second clause of the first sentence of subparagraph (4)(A). Under this reading, the term "savings association" applies to the institution resulting from an emergency transaction only where that institution is a savings association. If the first sentence is so read, section 13(k) remains silent on the matter of retention and operation of the branches of acquired thrifts where the surviving entity is a bank. This reading does not resolve the problems identified above that are resolved by reading "savings associations" in the second clause more broadly, but it is consistent with the Conference Report's silence on the subject of bank retention of acquired thrift branches. Under either this reading or the reading discussed above, espoused by the RTC, section 13(k) authorizes the preemption of state bank branching restrictions.
55 Fed.Reg. 22,323, 22,325.

7. The RTC explained:
As stated in the proposal, the RTC believes that the branching provisions of subparagraph (4)(A) of section 13(k) expressly allow banks to retain and operate as bank branches the thrift branches they acquire pursuant to section 13(k). The proposal indicated the RTC's belief that even if these branching provisions did not expressly address the matter of bank retention of acquired thrift branches, the power section 13(k) grants to the RTC to authorize emergency transactions "[n]otwithstanding and [sic] provision of State law", together with the RTC's rulemaking authority,

is broad enough to permit the RTC to fill such silence in the manner proposed.
55 Fed.Reg. 22,323, 22,325.

8. The statement adopting the final rule described the financial crises resulting from the disruption of the thrift industry that led to enactment of the Financial Institution's Reform, Recovery, and Enforcement Act of 1989. It acknowledged the substantial cost of FIRREA in restoring the thrift industry, quoting Senator Garn's statement that FIRREA is "without doubt the biggest single bill in the history of this country." 55 Fed.Reg. 22,323. The charge of Congress to resolve the cases of closed thrifts as expeditiously and cost effectively as possible was recognized. *Id.* The RTC commented that the limitations on bank branching can seriously impair the ability of the RTC to use the emergency provisions of subsection 1823(k). *Id.* at 22,324. Because of these limits, banks will often be willing to pay a substantial premium to acquire existing thrift branches as a means for branching and, absent this opportunity, bank holding companies are unlikely to bid for trouble thrifts, or will bid substantially less because of the cost of chartering and operating the branches as separate banks. *Id.* These last comments of the RTC are confirmed by the Commissioner's brief, which states that branch bank applications are usually very lengthy and expensive because some other entity may contest the application. It can take as many as two years after the filing before a branch is established, and the time can be longer if the appellate court remands the case to the Commissioner or circuit court for additional proceedings. *See* Commissioner's brief, page 40–41, n. 3.

9. The RTC stated:
Second, the Senate Report accompanying S. 774 (the Senate version of FIRREA and the source of section 13(k) as enacted by Congress) makes clear that the scope of the state law override authority in section 13(k) was intended to be very broad. The Report states

The RTC statement then rejects application of the McFadden Act, 12 U.S.C.A. § 36 (West 1989), reasoning that it is not the only statutory basis for branch banking, but that 12 U.S.C.A. § 1823(f) (West 1989) is as well and that subsection 1823(k) may also give such authority. 55 Fed.Reg. 22,-323, 22,326.

The RTC statement then addressed comments that it lacks statutory authority to adopt a regulation that goes beyond the express branching provisions, premised either on the absence of RTC's power because of the lack of an express statutory grant of authority or because the statute implies legislative intent to exclude branch retention authority for banks. The RTC rejected these arguments, citing *Lincoln Savings & Loan Association v. Federal Home Loan Bank Board*, 856 F.2d 1558, 1560 (D.C.Cir.1988), and *Mourning v. Family Publication Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973).

The detailed reasoning of the RTC in adopting 12 C.F.R. § 1611.1 expresses a construction of statutory authority for the regulation, and we now turn to the arguments of the parties to determine whether the construction is permissible under *Chevron*.

## II.

■ The RTC argues that Congress granted it broad rulemaking authority, and that this authority, coupled with express statutory authority to set the terms of the emergency transactions along with the override provisions of subsection 1823(k), supports the regulation in question.

The rulemaking authority is contained in 12 U.S.C.A. § 1441a(b)(12)(A) (West Supp. 1990): "The Corporation may issue such

rules, regulations, standards, policies, procedures, guidelines, and statements as the Corporation considers necessary or appropriate to carry out this section." Paragraph 1441a(b)(3) defines the duties of the corporation, which include conducting operations in a manner that:

> (i) maximizes the net present value return from the sale or other disposition of institutions described in subparagraph (A) or the assets of such institutions;
>
> (ii) minimizes the impact of such transactions on local real estate and financial markets;
>
> . . . . .
>
> (iv) minimizes the amount of any loss realized in the resolution of cases ....

The corporation is given powers and rights to carry out its duties as to conservatorship and receivership, specifically relating to 12 U.S.C. § 1823. Paragraph 1441a(b)(4) provides:

> Except as provided in paragraph (5) and in addition to any other provision of this section, the Corporation shall have the same powers and rights to carry out its duties with respect to institutions described in paragraph (3)(A) as the Federal Deposit Insurance Corporation has under sections 11, 12, and 13 of the Federal Deposit Insurance Act [12 U.S.C.A. §§ 1821, 1822, and 1823] with respect to insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act) [12 U.S.C.A. § 1813].

The RTC argues that the broad rulemaking authority, coupled with the commands that it maximize the return and minimize the losses on resolving failed thrifts, particularly bears on the language in 12 U.S.C.A. § 1823(k)(1)(A)(ii) that "mergers, consolidations, transfers and acquisitions ... shall

that "section 13(k) can be used to override all State law (including State constitutions), with one exception: section 13(k) does not override State laws that restrict the activities of a savings association on behalf of any other entity." S.Rep. No. 19, 101st Cong., 1st Sess. 320 (1989). The language of the branching provisions of S. 774 is identical to the language of the branching provisions in section 13(k) as enacted by Congress, as is the language in subparagraphs (1)(A)(i) and (ii) of

section 13(k) that provides that the RTC may authorize emergency transactions "[n]otwithstanding any provision of State law" and "on such terms as the [RTC] shall provide." The section 13(k) provisions of S. 774 are identical to the section 13(k) provisions ultimately enacted by Congress in every respect relevant to the RTC's proposal, and the Senate Report reflects the Senate Banking Committee's reading of those provisions. 55 Fed.Reg. 22,323, 22,326.

be on such terms as the [RTC] shall provide." The RTC argues that this section necessarily contemplates that the RTC may promulgate rules and regulations setting forth the terms of the emergency acquisitions. This argument has compelling force; when this grant of authority is considered together with the language commencing this subsection, "notwithstanding any provision of State law," we are satisfied that the RTC could permissibly read these sections as authority to promulgate 12 C.F.R. § 1611.1 overriding branch banking law incident to such transactions.

The Associated Bankers argue that the phrase "notwithstanding any provision of State law" in (k)(1)(A)(i) has application only to state laws that might prevent the transactions effectuating merger or consolidation, or transfer of assets and liabilities under (k)(1) and not to the branching provisions of paragraph (k)(4). We believe this is too restrictive a reading of this language. The "notwithstanding" phrase is the first phrase in the entire subsection dealing with emergency acquisitions, and the subsection covers mergers, consolidations, transfers and acquisitions, fleshing out the procedures in considerable detail. It is significant that the discussion of branching provisions in (k)(4)(A) makes specific reference to the "merger, consolidation, transfer or acquisition under this subsection" in evident reference to the authorization for these transactions in (k)(1)(A). This demonstrates the interrelationship of the paragraphs of the subsection and its unity, and reinforces our conclusion that the "notwithstanding" phrase has application to the entire subsection, including the subparagraphs under the caption "Branching provisions."

The structure of the subsection under consideration and the language used to describe portions of it compel this conclusion. The entirety of subsection (k) of section 1823 entitled "Emergency acquisitions" is referred to consistently as "this subsection" throughout, in (k)(1)(A)(ii), (iii), and (vi), and in (k)(2)(A), and (k)(3), as well as in

(k)(4)(A). We have no doubt that all of these references refer to the entire subsection (k) entitled "Emergency acquisitions." This conclusion is further supported by at least two references, in (k)(1)(A)(i)(I) and (k)(5)(A), to "subsection (c) of this section," which have evident reference to subsection 1823(c) entitled "Assistance to insured depository institutions." The usage of the terms "paragraph" and "subparagraph" underscore this conclusion.[10] The essence of the Independent Bankers' argument is that the phrase "[n]otwithstanding any provision of any law" is limited to paragraph (k)(1) and its subparagraphs (A) and (B), and with no application to paragraph (k)(4). As we have seen, the reference to "this subsection" in (k)(4)(A) prevents such a reading. The uniform system of reference to this subsection, other subsections, paragraphs, and subparagraphs demonstrates the cohesiveness of the subsection and the applicability of the "notwithstanding" clause to its entirety.

It is significant that (k)(1)(A)(vi) states "[n]othing in this subsection overrides or supersedes State laws restricting or limiting the activities of a savings association on behalf of another entity." This language again refers to the entire subsection and contains a single limitation on the override of state laws. The Senate Report refers to this language as the one exception to the override when it makes the following statement: "Thus new section 13(k) can be used to override all State law (including State constitutions), with one exception: section 13(k) does not override State laws that restrict the activities of a savings association on behalf of any other entity." S.Rep. No. 19, 101st Cong., 1st Sess. 320 (1989). It is also apparent that the language in (k)(1)(A)(vi) excepting from the override of state laws those laws that restrict or limit "the activities" of a savings association on behalf of another entity have undoubted reference to operation after disposition, giving further support to the con-

---

**10.** The references to "this paragraph" appearing in (k)(1)(B)(ii) and (iii) have evident reference to the acquisitions authorized in (k)(1)(A). References to subparagraph (A) appear in both (k)(1)(B)(i) and (k)(4)(B)(i), obviously referring to the immediately preceding subparagraphs.

clusion that we reach as to the scope of the override.

The broad grant of rulemaking authority is similar to that considered in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369–73, 93 S.Ct. 1652, 1660–63, 36 L.Ed.2d 318 (1973), where the Court stated: "[T]he validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Id.* at 369, 93 S.Ct. at 1660. Indeed, the RTC relied on *Mourning* in concluding that it had authority to adopt 12 C.F.R. § 1611.1.

The district court, accepting the argument of the Independent Bankers, held that the override power extended only to the acquisition of the branches. We are satisfied that the court erred in so ruling. The Associated Bankers' argument that the "notwithstanding" clause relates to the event of acquisition is further answered by the language in subsection (k), and particularly in the subparagraphs under branching provisions relating to retention and operation of branches.

The notice of proposed rulemaking with respect to 12 C.F.R. § 1611.1 made specific reference to the override provision and the power to set the terms for the emergency acquisitions as support for its proposed rule. 55 Fed.Reg. 13,543–44. The statement accompanying the final rule again refers to the authority to establish terms of the acquisition, the limited restriction on the override authority, and the broad rulemaking authority granted to the RTC in support of its action adopting the rule. 55 Fed.Reg. 22,323–28. We are convinced that the discussion in the notice and the statement demonstrate a permissible construction of subsection 1823(k).

### III.

The Independent Bankers and Commissioner argue that paragraph 1823(k)(4) relating to branching expressly permits a savings association, but not a bank, to retain and operate existing branches of the thrift. The RTC seemingly concedes that this provision may restrict the authority and its broad override, and squarely faces this possibility. It is this paragraph that is the center of the most vigorous conflict between the parties. Both the notice proposing and the statement adopting the rule discuss this paragraph at some length. Many of the comments answered were directed to it and the parties disagree in strong terms as to the meaning of the subparagraph. We set out this critical subparagraph again:

> If a merger, consolidation, transfer, or acquisition under this subsection involves a savings association eligible for assistance and a bank or bank holding company, a savings association may retain and operate any existing branch or branches or any other existing facilities. If the savings association continues to exist as a separate entity, it may establish and operate new branches to the same extent as any savings association that is not affiliated with a bank holding company and the home office of which is located in the same State.

12 U.S.C.A. § 1823(k)(4)(A).

There seems to be no dispute in any of the discussion that the first time the term "savings association" is used in the subparagraph, its reference is to a pre-transfer or acquisition entity, and the third time, in the second sentence, it refers to a post-acquisition entity. The controversy is whether the second use of "savings association" refers to a pre-acquisition entity or post-acquisition entity.

The district court found that an interpretation of this second usage of "savings association" as a post-transaction entity was implausible because it would render useless the very clause in which it appears. The court found that the section obviously meant that after acquisition, existing branches may be retained and operated if they are branches of a savings association, but not as branches of an acquiring bank. The RTC argues that "savings association" in the second clause is most plausibly read to be a pre-transaction entity with assets that either cease to exist as a result of the transaction, or emerge from it as a savings association that can be operated by the acquiror. It finds support for its reasoning

in the second sentence of the subparagraph, which uses the phrase "continue to exist as a separate entity" to modify "savings association." RTC argues that this indicates that the first sentence in contrast to the second addresses the different situation where the savings association may be absorbed into a bank.

The Independent Bankers argue that the second usage of "savings association" in sentence one means exactly what it says, "any corporation (other than a bank)." 12 U.S.C.A. § 1813(b) (defining "savings association"). They point out that elsewhere in FIRREA, Congress used the term "an insured depository institution," or a savings association or insured bank when it intended to refer to banks as well as savings associations, citing 12 U.S.C.A. §§ 1817, 1818 and 1821, and Congress used the term "savings association or any insured bank" when it wanted to include banks in 12 U.S.C.A. § 1823(k)(1)(A)(i). They argue that the statute means that a savings association, not a bank, may retain and operate the existing branches of the thrift. Worthen, on the other hand, argues that subparagraphs (A) and (B) of paragraph 1823(k)(4) should simply be read together, which produces the result that in general, post-transaction savings associations, whether owned by banks or not, may retain and operate existing branches subject to the restrictions of subparagraph (B).

The RTC in its notice proposing and statement adopting the regulation, 55 Fed. Reg. 13,543–44 and 55 Fed.Reg. 22,323, 22,325, reads the term "savings association" in the second clause as referring "to the savings association as it exists prior to consummation of the emergency transaction," 55 Fed.Reg. 22,323, 22,325, "even though it is no longer a savings association." 55 Fed.Reg. 13,543–44. Accordingly, this interpretation includes those savings associations that cease to exist upon consummation of the transaction, as well as those that continue to exist. It argues that if the clause is not read this way, merger and consolidation are effectively read out of the statute. Alternatively, it reasons that if the second usage of the term applies only to an institution resulting

from a transaction that is a savings association, it remains silent on the matter of retention and operation of the branches of thrifts where the surviving entity is a bank. Therefore, it finds silence that it has authority to fill. *Id.*

We could at this point simply conclude that the second usage of "savings association" is ambiguous, and that the RTC reached a permissible construction of the statute in adopting section 1611.1, as did the district court for the district of New Mexico in *Independent Community Bankers of New Mexico v. Resolution Trust Corp.*, (Civ.–90–532 SC), 1990 WL 119633 (June 15, 1990). *See Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. We are convinced, however, that the arguments asserted by the RTC have more compelling force than those to the contrary, giving strong support to the construction of the statute by the RTC, and that the district court erred in its ruling on this issue. We are persuaded by the argument that the second sentence of subparagraph (A) modifying "savings association" with the language "continues to exist as a separate entity" points to a reading of the first sentence as referring to a pre-transaction entity that may cease to exist because its assets and liabilities are absorbed by a bank. Further, the use of the terms "merger" and "consolidation" in the first sentence, as well as in the remainder of subsection 1823(k), looks to a resulting entity that could well be a bank. And if it cannot retain and operate the branches as bank branches, no merger or consolidation can occur.

The RTC argues with force that the interpretation of the district court that savings associations and not banks may operate the branches is contradictory to the concept of a merger or consolidation. This is the position set forth in the RTC's notice of proposal and adopting statement, and again we are satisfied that it is a permissible construction of the statute. We also find persuasive that the structure of paragraph (k)(4) suggests that subparagraph (A) is an enabling subparagraph that grants rights and subparagraph (B) enti-

tled "Restrictions," spells out in detail restrictions a bank must abide by to retain, operate, and establish branches. Further, we believe it to be reasonable to conclude that when the same term "savings association" is used twice in the same sentence, it is being used to mean the same thing both times and refers to the pre-transaction entity. Finally, we are satisfied that the override provision in subsection (k) which appears in (k)(1)(A)(i) applies to the branching provisions in subparagraph (k)(4)(A). We do not believe that such a broad override power would be restricted narrowly in a following provision, for to do so " 'would be to impute to Congress a purpose to paralyze with one hand what it sought to promote with the other.' " *Weinberger v. Hynson, Westcott & Dunning Inc.*, 412 U.S. 609, 631, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973) (quoting *Clark v. Uebersee Finanze–Korp.*, 332 U.S. 480, 489, 68 S.Ct. 174, 178, 92 L.Ed. 88 (1947)).[11]

We conclude that the RTC reached a permissible interpretation of subsection 1823(k) as statutory authority to promulgate 12 C.F.R. § 1611.1.

We believe that the district court in essence gave de novo consideration to the interpretation of subsection 1823(k) rather than considering it under the standards set out in *Chevron*. Our conclusion in this respect is based not only on a reading of the district court's opinion, but on its reliance upon the district court decision in *Colorado ex rel. Colorado State Banking Board v. Resolution Trust Corp.*, No. 90–Z–190, 1990 WL 51191 (Dist. of Colo. Feb. 14, 1990), and its refusal to follow the *Independent Community Bankers Association of New Mexico* case that we have referred to above. The Colorado case was decided before promulgation of section 1611.1, and while it can have some persuasive force with respect to the administrative action of the RTC, it does not deal with a rule formally proposed and adopted. The district court thus relied on a case having limited applicability to the situation before it. On the other hand, the district court gave short shrift to the New Mexico case which was decided after promulgation of the rule, and which analyzed section 1611.1 and its statutory support under the rules announced in *Chevron*. Although the district court rejected the New Mexico decision, we believe that its analysis has persuasive force.

The RTC's final fallback position, both in its brief and in the notice proposing and the statement adopting the regulation, is that the term "savings association" in the second clause of the first sentence can be read as containing a silence concerning banks operating thrifts, and the silence, under *Chevron*, may be filled in by the agency. 55 Fed.Reg. 13,544. As *Chevron* states:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

467 U.S. at 843, 844, 104 S.Ct. at 2782, 2783. This reasoning is further support for the conclusion we reach.

### IV.

Other comments in *Chevron* have particular application. This case presents a situation where there are manifestly competing interests.[12] The regulatory scheme, only

---

**11.** The dissent's reliance on the Conference Report is misplaced. As the RTC's statement recognizes, "[t]he Conference Report on FIRREA provides no guidance as to how the first sentence of subparagraph (4)(A) should be read." 55 Fed.Reg. 22,323, 22,325. The Conference Report makes explicit reference to the restrictions in subparagraph (k)(4)(B), but these restrictions have no application to the situation before us. Further, the RTC explained that subsection (k) originated in the Senate, giving the Senate Report particular relevance. S.Rep. No. 19, 101st Cong., 1st Sess. 115–17. *See supra* footnote 9. The Senate Report discussed the broad override provisions of subsection (k) with the one exception we discussed earlier. 55 Fed.Reg. 22,323, 22,326. *See supra* p. 169–170.

**12.** Not only do the several parties present strongly conflicting interests, but the competing interests involved are further demonstrated by the filing of amicus briefs by the Conference of State Bank Supervisors and the Independent Bankers Association of America on behalf of the

part of which has been under consideration in this case, is technical and complex and the decision involves reconciling conflicting policies. The RTC considered the issue in a detailed and reasoned fashion as demonstrated by the notice proposing and the statement adopting the regulation. *See* 467 U.S. at 865, 104 S.Ct. at 2793. As *Chevron* suggests, Congress may have consciously desired that the administrator strike the balance at the level of specificity presented in this case. Possibly it did not consider the issue or possibly was unable to forge a coalition on either side of the questions. *Id.* To an extent, as in *Chevron*, the arguments are based upon policy considerations.[13]

Although not so precisely argued, the issue of federal preemption lies beneath the surface of the Commissioner's and Independent Bankers' arguments. The Supreme Court has made clear, however, that preemptive regulation does not require express congressional authority to displace state law. The correct focus is on "the proper bounds of [the agency's] lawful authority to undertake such action." *City of New York v. FCC,* 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988). The Supreme Court in the *City of New York* continued:

> The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. Beyond that, however, in proper circumstances the agency may determine that

its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area.

*Id. See also Lincoln Sav. & Loan v. Federal Home Loan Bank Bd.,* 856 F.2d 1558, 1560 (D.C.Cir.1988) (citing *City of New York*). We conclude that there is no infirmity in the RTC's authority to preempt state banking laws under section 1611.1.

## V.

The Commissioner and the Independent Bankers strongly urge that the regulation is contrary to the McFadden Act, 12 U.S.C.A. § 36(c) (1989). The McFadden Act permits a national banking association to establish branches "if such establishment and operation are at the time authorized to State banks by the statute law of the State in question...."[14] The Independent Bankers argue that nothing in subsection 1823(k) or elsewhere in FIRREA preempts, modifies or repeals the McFadden Act, and the override provision of paragraph (k)(1) of section 1823 applies only to state and not federal law. The district court gave short shrift to the applicability of the McFadden Act as it did not believe it to be clear that the branches Worthen would be operating under the RTC override would be created pursuant to 12 U.S.C.A. § 36. The district judge states that if he was incorrect, this would be further support for his conclusion.

The Comptroller of the Currency argues that the McFadden Act confers

---

Appellees, and by the Arkansas Association of Bank Holding Companies on behalf of the Appellants.

**13.** The Commissioner presents a detailed argument that *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), a decision relied upon by the RTC in its statement adopting the rule, *see supra* section II, does not support the action because some 212 failed or failing thrifts have been disposed of, and only two have involved use of the override. Thus, it can hardly be argued that this power is necessary to enable the RTC to carry out its mission of disposing of failed savings associations. RTC differs citing four override orders in addition to Arkansas. In any event, at its base, this argument goes to policy issues best presented to and decided by the agency.

**14.** 12 U.S.C.A. § 36(c) states:

> (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

upon that office routine authority to approve national bank branches, and that the emergency grant of power under FIRREA, and specifically subsection 1823(k), does not preclude the RTC from overriding Arkansas' branch banking statute. The Comptroller points to other authority for branching included in 12 U.S.C.A. § 1823(f)(4). The district court dismissed applicability of this paragraph with the comment that it applied to the acquisition of an insured bank or holding company by an "out of state" bank, savings association, or holding company. 12 U.S.C.A. § 1823(f)(1). While paragraph (f)(4) very plainly applies to acquisition by out-of-state entities, this does not detract from the fact that it is additional authorization for branching. The chief counsel of the Office of the Comptroller submitted a comment letter to the RTC in the rulemaking proceedings stating the Comptroller's position that the McFadden Act was not the exclusive source of banking authority for national banks, and therefore other federal statutory law such as 12 U.S.C.A. § 1823(k) can provide branching authority in addition to the McFadden Act. The Comptroller of the Currency's interpretation of the National Bank Act is entitled to great deference. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403–04, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987). The Comptroller correctly asserts that the McFadden Act and FIRREA may separately exist and that the McFadden Act does not limit subsection 1823(k).

The Commissioner argues that the legislative history supports his position that the override provision has no application to conversions from thrift to bank charters, and does not circumvent the McFadden Act. The commissioner points specifically to two exchanges, one on the floor of the House [15] and one on the floor of the Senate [16] containing such statements. We are satisfied that these statements are not relevant to our discussion. While the Conference Report makes reference to emergency acquisitions of failing thrifts, the discussion does not use the term "conversion." 135 Cong.Rec. H5279–80 (daily ed. August 4, 1989) (FDIC's ASSISTANCE AND DEFAULT PREVENTION AUTHORITY). Conversion is discussed in another portion of the report. *Id.* at H5278–79 (CONVERSION FROM MEMBERSHIP IN ONE INSURANCE FUND TO ANOTHER). The reference tracks the language of 12 U.S.C.A. § 1815(d)(2) relating to the transfer of an institution from the bank insurance fund to the savings association insurance fund, or vice versa.[17] The notice proposing and the statement adopting the rule gave such a reading to the statement of Congressman Leach and the exchange between Senators Wirth and Riegle, as well as observing that the conference reports on emergency acquisition and conversion treated the two as separate items with no cross-reference. 55 Fed.Reg. 22,325–26.

■ Even if these statements on the floor of the House and Senate have greater

**15.** Congressman Leach of the House Banking Committee made the following statement in remarks that have been edited:

First, that provisions of this act that permit thrifts to be converted to thrifts are not intended to allow banks resulting from such conversions to establish, retain, maintain, or operate branches that do not comply with the laws relative to establishment and operation of bank branches or offices in the respective States where such banks are operated. In other words, the Douglas or McFadden Acts are not intended to be circumvented or modified by this statute.

135 Cong.Rec. H4980, daily ed. August 3, 1989).

**16.** The Commissioner relies on the following exchange between Senator Wirth and Senator Riegle, of the Senate Banking Committee:

Mr. WIRTH.

Is it correct that the provisions of this act that permit thrifts to be converted to banks are not intended to allow banks resulting from such conversions to establish, retain, maintain, or operate branches that do not comply with the laws relative to the establishment and operation of bank branches or offices in the respective States where such banks are located?

Mr. RIEGLE. The Senator's statement is correct.

135 Cong.Rec. S10,200 (daily ed. August 4, 1989).

**17.** The more extended remarks of Congressman Leach in referring to the conversion moratorium has clear reference to Section 1815(d)(2) Conversions. (135 Cong.Rec. H4980. (daily ed. August 3, 1989).

relevance, committee reports, to which we have already referred, *see* II, *supra,* are more probative of congressional intent than such floor statements. *Garcia v. United States,* 469 U.S. 70, 76 and n. 3, 105 S.Ct. 479, 483 and n. 3, 83 L.Ed.2d 472 (1984) (quoting *Schweigman Bros. v. Calvert Distillers,* 341 U.S. 384, 395, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (Jackson, J., concurring)). Isolated remarks of a bill sponsor that are ambiguous are not sufficient to demonstrate congressional intent. *Weinberger v. Rossey,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982).

We reverse and vacate the judgment of the district court entering declaratory and injunctive relief and the holding that 12 C.F.R. § 1611.1 is unlawful, null and void. The case is remanded to the district court with instructions to enter judgment denying the claims of the Commissioner and Association of Independent Bankers for declaratory and injunctive relief.

HEANEY, Senior Circuit Judge, dissenting.

I would affirm the district court. There is no ambiguity or gap in the statute. Only one subsection of 12 U.S.C. § 1823(k), namely, subsection (4), deals with branching, and subsection (4) does not permit a bank which acquires more than one savings and loan association to convert the acquired associations into branches of the acquiring bank.

## I. THE STRUCTURE AND LANGUAGE OF SECTION (k)

Subsection (k) of Title 12, section 1823 deals with emergency acquisitions of savings and loan associations. The section defines the associations which may be assisted, requires that state officials be consulted before action is taken, establishes a procedure for solicitation of offers from qualified purchasers, and defines "troubled" savings and loan associations. Most importantly for this case, subsection (4)(A) deals specifically with branching:

**(k) Emergency acquisitions.**

. . . . .

**(4) Branching provisions.**

**(A) In general.**

If a[n] ... acquisition under this subsection involves a saving association eligible for assistance and a bank or a bank holding company, *a saving association may retain and operate any existing branch or branches or any other existing facilities.* If the savings association continues to exist as a separate entity, it may establish and operate new branches to the same extent as any savings association that is not affiliated with a bank holding company and the home office of which is located in the same State.

12 U.S.C. § 1823(k)(4)(A) (emphasis added).

The language of subsection (4)(A) fits the instant transaction perfectly. A bank seeks to acquire savings associations eligible for assistance. To the extent that any of the associations acquired have branches and to *the extent that the acquired association retains its identity* as an association, it can continue to operate the existing branches. Moreover, if the association retains its identity as an association, it may establish and operate new branches to the same extent as any association not affiliated with a bank holding company whose home office is located in the same state.

The Congress could have authorized an acquiring bank or bank holding company to convert acquired associations into branches, but it did not. It could have authorized the Resolution Trust Corporation (RTC) to override state laws against branch banking, but it did not. It could have repealed or modified the branch banking provisions of the McFadden Act, but it did not. Neither the RTC nor this court has a right to rewrite the statute to accomplish a goal not permitted by the statute itself. Neither the RTC nor this court has a right to create ambiguities where none exist.

I will not discuss the question of ambiguity further, lest my discussion be perceived as giving credence to the view that the statute is vague or ambiguous or that Congress left a gap to fill. It is important, however, to show the lack of substance of several of RTC's arguments.

## II. THE MCFADDEN ACT

The McFadden Act is the principal source of banking authority for national banks. "The conditions under which national banks may establish branches are embodied in ... the ... Act." *First National Bank of Plant City v. Dickinson*, 396 U.S. 122, 130, 90 S.Ct. 337, 341, 24 L.Ed.2d 312 (1969). Neither this court nor the Supreme Court has questioned the branching provision of the McFadden Act. This authority tracks the language of the Act itself, which states in unequivocal terms "[t]he conditions upon which a national banking association may retain or establish and operate a branch or branches...." 12 U.S.C. § 36.

The branch banking issue spans the twentieth century. Throughout this period, national banks have been vying to encroach upon the territory of state banks. During the 1920s, this issue came to one of its many climaxes when the Supreme Court held that national banks did not have the implied power to branch. *First National Bank v. Missouri ex rel. Barrett*, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924). The year before this decision, the Comptroller, in his Annual Report of 1923, argued that if state banks continue to practice "unlimited branch banking[,] it will mean the eventual destruction of the national banking system." HR Doc. No. 90, 68th Cong., 1st Sess. 6 (1924). In reaction to the Supreme Court's decision and the Comptroller's advocacy, Congress passed the McFadden Act in 1927. Act of Feb. 1927, ch. 191, § 7, 44 Stat. 1224. This Act imposed what has come to be known as the competitive equality regime, substantively providing that in cities where state banks are permitted to operate branch offices, national banks have a similar privilege. While bolstering the branching privileges of national banks, Congress acknowledged the preeminence of state authority to establish the limit of branch banking activity.

Over the years, the thrust of the McFadden Act has shifted. Initially, the Act was a reaction to discrimination against national banks; hence, the Act sought to guarantee national banks the same branching rights that state-chartered banks enjoyed. In this regard, competitive equality meant allowing national banks to compete with state banks. The Act soon, however, became a means of restraining rather than liberating national banks.[18]

The current effect of the McFadden Act is to prevent national banks from exceeding the limits that states impose on branch banking. More pointedly, the Act is regularly used to thwart the desire of the Comptroller to ignore state limitations on branch banking. The Comptroller has vented his hostility to the McFadden Act through both legislative and judicial channels. As early as 1931, the Comptroller lobbied Congress to permit national banks to branch regardless of state law. Hearings before a Subcommittee of the Senate Committee on Banking and Currency pursuant to S.Res. No. 71, 71st Cong., 3d Sess., 7–10 (1931). These efforts have continued unabated to the present.

The repeated failure of the Comptroller to persuade Congress to repeal the competitive equality regime did not deter his hostility to the branching provisions of the McFadden Act. The Comptroller has regularly certified national banks to operate branch facilities in states where the legality of such activity is suspect. Both the Supreme Court and this court have routinely overruled the Comptroller's decisions. *See First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (overruling the technical

---

**18.** Even in its inception, restraining national banks (and the Comptroller of the Currency) was a purpose behind the Act. During the House debates over the McFadden Act, Representative Stevenson of South Carolina explained:

[Y]ou have branches in the Federal reserve system established by the dictum of the Comptroller of the Currency, who has assumed [*sic*] to say that he can allow a nation-

al bank to establish as many agencies for receiving deposits and paying checks as he sees fit.... I will show presently that we cut that out, root and branch.

66 Cong.Rec. 1627 (1925).

Similarly, Congressman McFadden described the act as an "anti-branch banking measure severely restricting the further spread of branch banking in the United States." 68 Cong.Rec. 2166 (1927).

finessing of the Comptroller and holding that the Comptroller-certified activity was in substance a branch bank in violation of state and thus federal law); *First Nat'l Bank of Logan, Utah v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) (overruling the Comptroller's certification of a branch bank as a violation of state and thus federal law); *Dakota Nat'l Bank & Trust Co. v. First Nat'l Bank & Trust Co. of Fargo,* 554 F.2d 345 (8th Cir.1977) (enjoining the Comptroller from issuing a branch certificate after First National successfully petitioned the Comptroller to have its existing branch re-characterized as an "extension" so that the bank could then open a second branch), *cert. denied,* 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157 (1977); *St. Louis City Nat'l Bank v. Mercantile Trust Co. Nat'l Assoc.,* 548 F.2d 716 (8th Cir.1976) (overruling the Comptroller's decision that a trust office, which did not accept deposits, make loans, or pay checks, was not a branch and holding that the trust office was operating in violation of state and thus federal law), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2975, 53 L.Ed.2d 1093 (1977); *State of Missouri ex rel. Kostman v. First Nat'l Bank in St. Louis,* 538 F.2d 219 (8th Cir.1976) (overruling the Comptroller's decision that automatic teller machines were not branch banks); *Nebraskans for Indep. Banking, Inc. v. Omaha Nat'l Bank,* 530 F.2d 755 (8th Cir.) (overruling the Comptroller's decision that a facility was not a branch office), *vacated and remanded for reconsideration in light of subsequent state legislation,* 426 U.S. 310, 96 S.Ct. 2616, 48 L.Ed.2d 658 (1976); *Driscoll v. Northwestern Nat'l Bank of St. Paul,* 484 F.2d 173 (8th Cir.1973) (referring to the Comptroller's decision as "quite disturbing," the court instructed the Comptroller to reconsider his decision).

These cases and the Comptroller's past lobbying efforts offer a historical perspective from which much can be gleaned.

From this vantage, the RTC rule is easily identified as yet another attempt by the Comptroller (this time aided by the RTC) to circumvent the branch banking provisions of the McFadden Act.

The RTC asserts in the rule that the McFadden Act is not the exclusive source of banking authority for national banks. It cites as authority for this claim 12 U.S.C. § 1823.[19] If the RTC means to suggest that Congress can override the branching provisions of the McFadden Act, I have no quarrel with the assertion. The fact of the matter is, however, that the McFadden Act remains the principal source of authority for national banks, and the branching provisions of that statute remain effective until repealed.

> [R]epeals by implication are not favored, see, e.g., *TVA v. Hill,* 437 U.S. 153, 189, 57 L.Ed.2d 117, 98 S.Ct. 2279 [2299] (1978), and will not be found unless an intent to repeal is ' "clear and manifest." ' *United States v. Borden Co.,* 308 U.S. 188, 198, 84 L.Ed. 181, 60 S.Ct. 182 [188] (1939) (quoting *Red Rock v. Henry,* 106 U.S. 596, 602, 27 L.Ed. 251, 1 S.Ct. 434 [439] (1883))."

*Rodriguez v. United States,* 480 U.S. 522, 524, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987).

Amendments by implication are similarly disfavored. "This is a basic premise of our representative democracy; legislatures, not courts, amend and repeal statutes." *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 318 (D.C.Cir.1988). Here, neither the statute nor the legislative history indicates an intention to amend the branch banking provisions of the McFadden Act except to the extent specifically pointed out in subsection (k)(4)(A).

## III. LEGISLATIVE HISTORY

The RTC relies on the Senate Report that accompanied section 1823(k) out of the Senate Banking Committee to support its as-

---

**19.** It is interesting to note that this statute does not authorize the FDIC to override state banking prohibitions. Indeed, it requires the FDIC to obtain permission of the state bank supervisor of the state before it can proceed. It further provides that an acquiring bank can only operate existing branches of banks acquired. The provisions of § 1823 indicate that Congress knew exactly what it was doing in that case as well as in subsection (k)(4)(A).

178

sertion that the section permits it to override state branch banking law. This reliance is misplaced. The RTC concedes that the Senate Report is silent with respect to subsection (4), the statutory language which is critical here. Moreover, the House version of the FIRREA was passed in lieu of the Senate version. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 86 (dates of consideration and passage).

The only meaningful discussion of section 1823(k)(4) in the legislative history appears in the conference committee report on the bill:

### FDIC'S ASSISTANCE AND DEFAULT PREVENTION AUTHORITY

The FDIC is empowered to provide financial assistance to prevent the default or failure of insured savings associations as well as insured banks. Assistance payments must be made from SAIF i[f] they are made to or for the benefit of an insured savings association.

Title II grants to the FDIC authority similar to FSLIC's emergency authority to arrange acquisitions of failing thri[f]ts. The amendments curtail severely the extent to which other Federal law may be waived in such acquisitions. The amendments also remove the procedures under current law that give priority to in-State thrift acquirers of failing thrifts. *The acquisition of failing thrifts by banks or bank holding companies is authorized. A thrift subsidiary of a bank or bank holding company may branch in the same manner as a savings association (not affiliated with a bank holding company) that has its home office in the same state as the home office of such thrift subsidiary.* Finally, emergency acquisition authority is amended to grant to the FDIC discretion to provide assistance to certain savings associations located in economically depressed regions.

H.Conf.Rep. No. 101–222, 101st Cong., 1st Sess. 398, *reprinted in* 1989 U.S.Code

Cong. & Admin.News 437 (emphasis added). The emphasized language describes subsection 1823(k)(4). As applied here, it suggests that if the Worthen Bank and Trust Company acquired a savings and loan which became a subsidiary of Worthen, the savings and loan could operate branches in the same manner as an independent savings and loan could under Ark. Code Ann. § 23–37–404. The conference report is consistent with the plain language of subsection 1823(k)(4). A savings and loan association that merges or consolidates with a bank, is acquired by a bank, or whose assets are transferred to a bank may retain and operate any *existing* branches *as savings and loans.* Only if the acquired savings and loan retains its separate corporate identity as a subsidiary of the acquiring bank may it establish and operate *new* savings and loan branches as provided for under state law.

The brevity of the conference report's discussion of the statutory language at issue suggests that its drafters found it as unambiguous as I do. Moreover, in view of the long history of unsuccessful attempts by the Comptroller of the Currency to override state branch banking laws, it seems highly unlikely that Congress would now implicitly authorize such an override without at least memorializing its intention to do so in the legislative history of the statute that purports to create the authority.

### IV. POLICY ARGUMENTS

The RTC makes a number of policy assertions to support the rule promulgated by it, assertions which the majority adopts. The principal assertion is that banks will be willing to pay more for troubled associations if they are permitted to retain and operate the associations as branches of the bank. Absent this option, the RTC asserts, banks and holding companies would not bid for troubled thrifts at all, or would bid substantially less because of the cost of chartering and operating the branches as separate banks. This assertion may or may not be valid. The RTC did not file the rule-making record with this court. Thus,

we have no way of testing the validity of the assertion. Moreover, no evidence was introduced before the trial court to support the proposition that use of the override would save the RTC substantial sums of money.[20]

It is for the Congress of the United States, not this court, to establish federal banking policy. If the Congress had desired to permit the RTC to override state branch banking restrictions, it would have said so.

## V. THE *CHEVRON* ARGUMENT

The majority justifies its decision on the basis of *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* states that if a statute is silent or ambiguous with respect to the *specific issue,* the question for the court is whether the agency's interpretation is based on a permissible construction of the statute. Here, the statute is neither silent nor ambiguous on the issue of branching. Thus, the rule in *Chevron* does not apply.

The RTC has manifestly gone to great lengths to create a gap and an ambiguity, but no administrative agency can bootstrap itself into a position where it can by rule fill a gap or resolve an ambiguity where neither exists. I could not disagree more with the statement in the majority opinion that contradictory arguments raise the specter of ambiguity. If this were the case, there would be no limit on the ability of administrative agencies to interpret statutes as they see fit, particularly where the administrative agency is the party asserting the ambiguity.

I have already noted the long history of the Comptroller of Currency's efforts to persuade the Congress to amend the branch banking provisions of the McFadden Act and failing that, to avoid the provisions of state laws prohibiting branch banking. This is but another attempt by the Comptroller of Currency, assisted by the RTC, to accomplish the long-term goal of permitting uninhibited branch banking. Each of us may have our own personal opinion as to whether the long-term interest of this nation will be better served by fewer and larger banks with unlimited branches, but it certainly is not within the prerogative of this court to resolve that very important question in this case.

## VI. THE RULE–MAKING ARGUMENT

The RTC argues that because Congress has given it broad rule-making authority, it can override Arkansas laws with respect to branch banking. This argument fails for the same reasons the *Chevron* argument fails. An agency's rule-making authority cannot be used, irrespective of its breadth, to override the clear and unambiguous language of a statute. *Cf. Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 (stating that courts must reject administrative constructions that are contrary to clear congressional intent).

For the reasons stated above, I respectfully dissent.

---

20. During oral argument, we queried both the appellants and appellees with respect to the validity of the assertion. The appellees disputed the assertion that an override would save money and claimed that RTC had successfully offered several associations for sale without an override provision. Appellants continued to make the assertion, but conceded that no evidence in the record before this court supported its claim of increased costs.

We also queried the appellees with respect to their assertion that if the override were implemented, other state and national banks in the state would be placed at a significant competitive disadvantage. They were unable to point to evidence in the record to support this assertion. The upshot of the matter is the state of the record leaves us no alternative but to make our decision on the basis of the language of the statute.